781 So.2d 88 (2001)
STATE of Louisiana
v.
Orenthal T. ALLEN.
No. 99-KA-2579.
Court of Appeal of Louisiana, Fourth Circuit.
January 24, 2001.
Rehearing Denied March 15, 2001.
Honorable Richard Ieyoub, Attorney General, Honorable Darryl W. Bubrig, Sr., *89 PointealaHache, LA, and Gilbert V. Andry, IV, Assistant District Attorney, New Orleans, LA, Counsel for Plaintiff/Appellee.
Orenthal T. Allen, Cottonport, LA, In Proper Person, Defendant/Appellant.
Court composed of Judge BYRNES, Judge PLOTKIN, and Judge MURRAY.
MURRAY, Judge.
Defendant Orenthal T. Allen appeals his conviction for aggravated sexual battery and his sentence of fifteen years at hard labor, without the benefit of parole, probation, or suspension of sentence to be served consecutivelywith another sentence. For the following reasons, we affirm the conviction, but remand the case to the trial court for consideration of a motion to reconsider sentence.

STATEMENT OF THE CASE:
On September 24, 1997 Orenthal Allen was indicted for the aggravated rape of a child under the age of twelve, a violation of La.Rev.Stat. 14:42. On November 3, 1998, the date the case was called for trial, the State amended the indictment to a charge of aggravated sexual battery, and Mr. Allen entered a guilty plea to the amended charge. The trial court then ordered a presentence investigation report. On April 20, 1999, the State's request for a sentencing hearing was granted over the defendant's objection. After hearing testimony and granting the State's request that he review the pretrial hearing transcripts, the trial judge[1] continued the sentencing to May 19, 2000. On that date, Mr. Allen was sentenced to serve fifteen years at hard labor without the benefit of probation, parole, or suspension of sentence, with credit for time served to run consecutively with another sentence Mr. Allen was presently serving. Defense counsel objected and gave notice of intent to appeal the sentence. A motion to reconsider sentence was filed the next day, but was continued without date because of the pending appeal.

STATEMENT OF THE FACTS:
Because Mr. Allen entered a guilty plea, there is no trial transcript in this case. The transcript of the guilty plea reflects that the assistant district attorney gave a brief statement of what evidence the State would have presented had the case gone to trial. According to the State, the victim W.H.[2] would testify that between August 17 and October 22, 1996, at her grandmother's home in Empire, Mr. Allen "forced himself upon her, by either inserting his penis into her vaginal area or on the surface of it and forcing her and holding her down and forcing her and threatening her not to talk." The State also would have presented a videotaped statement from the victim and supporting witnesses, specifically Tina Lafrance. The State also averred that the victim had undergone extensive therapy for the mental trauma caused by the defendant's actions.
In addition to the factual basis for the plea that was provided by the State, the record contains copies of the pretrial hearing transcripts. On February 10, 1998, Detective Mary McClendon of the Plaquemines Parish Sheriffs Office testified that she became involved in the investigation of Mr. Allen just before the holidays in 1996 when family services contacted the sheriffs department and forwarded a copy of *90 medical reports on the victim. Detective McClendon subsequently interviewed W.H.; the child told the detective that "her sister's boyfriend, Little Bit, had put his birdie in her private." W.H. also told the detective that her brother Davey had done the same thing. Detective McClendon also conducted a video interview with W.H, during which W.H. was given anatomical dolls. She pulled the pants down on the male doll and the female doll, then put the male doll on top of the female, placed the doll's penis inside the private area of the female, and stated that "this is what they did to me." At the time, W.H. was seven years of age, and it was based on her age that the detective determined that the incident occurred between August 17 and October 22, 1996, the latter date being the date W.H. was removed from her family's residence. Detective McClendon further testified that Mr. Allen made no statements and no physical evidence was seized from him. Although the victim could not provide any name for Mr. Allen except Little Bit, Detective McClendon was able to confirm that Mr. Allen, who was the boyfriend of the victim's sister and the father of at least one of her children, was known by that nickname.
The State also called Patricia Jackson, an investigator with child protection services. She testified that her investigation began in September 18, 1996 when her office received a call that the victim had been sexually abused and was wearing a pair of underwear with blood in them. Ms. Jackson spoke with both W.H. and her mother. W.H.'s mother apparently confirmed that her daughter had been wearing a pair of underwear containing a discharge, but "she didn't know if they were her underwear, if it was actually for the child and she didn't know if the underwear were dirty when the child put them on or if they were clean." Ms. Jackson was not able to recover the underwear. She referred W.H. to Children's Hospital for an evaluation, which was conducted on October 22, 1996 by Dr. Scott. Benton. Dr. Benton reported to Ms. Jackson that, based on his interview with W.H., he believed she had been raped. A copy of Dr. Benton's written report was filed into the record with the State's discovery answers. W.H. later spoke with Ms. Jackson and related that her brother had "touched her private," but never related that Mr. Allen had done so.
Robin Penegal of the Office of Community Service testified that she became the case manager for W.H. after she was placed in foster care. Ms. Penegal and W.H. spoke about nightmares that W.H. was experiencing. Ms. Penegal also received reports from the sexual abuse therapy group to which the victim had been referred. The reports indicated that during group sessions, W.H. identified her sister's boyfriend and her brother as the perpetrators.
On April 14, 1998, W.H. was called as a witness. She testified that she was eight years old and lived in Harvey. When asked why she was living there, she stated it was because she had been abused. She stated that her social worker Ms. Robinson [Robin Penegal] told her she had been abused. W.H. further testified that she used to live with her mother, her grandmother, her older brother Davey, her cousin Kursha, and her little brother Christopher. Her "paw-paw" Lenny also lived with them. W.H. identified Mr. Allen as Orenthal, who used to be her sister Rolita's boyfriend. According to W.H., her sister was twenty-one and used to live with her also. W.H. was unable to recall how often Mr. Allen visited her sister Rolita or how long he would stay; however, she stated that she could not recall him spending the night. W.H. stated that she shared a room with her grandmother and *91 that her brother slept on the floor, but did not know in which room her brother slept. During the hearing, W.H. was unable to give any other testimony regarding her interactions with Mr. Allen; she denied "ever doing anything with him" or being alone with him. According to W.H., her grandmother and paw-paw were always with them. In further questioning, W.H. gave no responses to questions about what Mr. Allen did that she thought was not right and ultimately indicated that she could not talk about it. During a recess, the court noted for the record "that the witness became emotional, cried and could not talk about the incident or appeared not to be able to talk about the incident."
After the recess, the defense called the victim's brother Davey to testify. He stated that he was fifteen and had been living with his father in Lafayette for approximately a year and a half; he formerly lived with his mother and her children. He denied that his grandparents lived with them. He further testified that his sister Rolita lived with another sister, Mia. Davey identified Mr. Allen as Rolita's fiancé and the father of her two children. He further testified that Mr. Allen did not visit at his mother's house. Davey denied ever seeing Mr. Allen touch W.H. He admitted that he knew W.H. had accused him of sexually abusing her and that her accusation included the allegation that he and Mr. Allen had abused her in the same room at the same time. He denied that any such abuse ever occurred. According to Davey, the accusations against Mr. Allen began because in 1996 Davey's mother had asked Mr. Allen to obtain drugs for her. When he refused, she threatened him that he was "gonna be sorry." Davey also testified that he had known W.H. to lie; on one occasion she had told their mother that her cousin Tashon had touched her and had sex with her. Davey contradicted his earlier testimony and stated that Mr. Allen did come to their trailer on occasion, but would only stay for about 20 minutes. The incident wherein his mother asked Mr. Allen to get drugs for her took place in their trailer.
On May 12, 1998, the victim was again called to testify, but this time Ms. Robin Penegal accompanied her, and sat beside her during questioning. The defense objected, but the trial court permitted it because it was only a preliminary proceeding at which no jury was present. W.H. repeated her testimony regarding her living arrangements with her mother, grandparents, brothers, sister Rolita, and cousin Kursha. W.H. initially could not recall Mr. Allen ever visiting at her house. She also stated that she was "never around him" but then testified that she would talk to him "by her grandma." W.H. also gave a negative answer to the question of whether Mr. Allen had ever touched, hugged, or kissed her. When asked if she could "think of anything he ever did to you," W.H. replied "No." In further questioning, W.H. admitted that she knew "what men and women do with each other;" but when asked if she had ever done anything like that with "Little Bit," she did not respond. At that point, the court interrupted for a sidebar conference with Ms. Penegal, the victim's caseworker, in an attempt to determine if the questions could be phrased differently for the victim, although the defense counsel expressed discomfort at asking leading questions. When the witness was again unresponsive, the defense counsel changed his line of questioning to ask the victim about how she became acquainted with Ms. Penegal; the victim again stated that it was because she had been sexually abused. W.H. denied any recollection of ever telling anyone, including Ms. Penegal, the assistant district attorney, or the sheriff's detective, that "someone had done it with" her; she then testified *92 that she told her mother and her next door neighbor (whose name she did not remember) that she had done it with somebody. W.H. could not remember exactly what she told her mother and neighbor, but she remembered she told them she had done it with her brother. W.H. then repeatedly denied ever telling her mother or her neighbor that she had "done it" with anybody other than her brother.
In still further questioning, W.H. was again asked if she could "remember anybody ever doing anything to you?" at which point she testified that Mr. Allen and her brother David "had sex" with her. When asked to explain what she understood by the term "had sex," W.H. replied that it meant "he did it with me." When asked what "did it with me" meant to her, W.H. stated that it meant, "He sexually abused me." W.H. was unable to answer the specific question, "What did he do to you?" At this point in the hearing, the trial court called for a break for the witness. After the break, defense counsel repeated his question, but W.H. was again unable to respond because she could not remember.

ERRORS PATENT:
A review of the record for errors patent reveals none.

ASSIGNMENTS OF ERROR NUMBER 1 & 2:
In his first assignment of error, Mr. Allen contends that he was denied due process of law because the evidence was insufficient to support a conviction for aggravated sexual battery. He notes that a plea to this charge was entered because of the State's intention of prosecuting him for aggravated rape. Mr. Allen, who is now proceeding without counsel, states that he entered the plea "because of the fact that if he would have proceeded to trial and been found guilty, he would have been exposed to a mandatory life sentence instead of a maximum fifteen years for aggravated sexual battery." The appellant further contends that, if he had gone to trial, he would have had a good chance of acquittal because of the lack of evidence. This void of evidence is reflected in the pretrial hearing transcripts, notably the victim's inconsistent statements about her contact with the defendant, and because all the other testimony was hearsay. Finally, Mr. Allen suggests that, if he is guilty of any crime, it would be no more than simple sexual battery.
In his second assignment of error, Mr. Allen contends that the trial court erred in its pretrial ruling that the videotaped interview of W.H. would be admissible at trial. This argument is closely related to his first assignment of error because the admissibility of the videotape is governed by La.Rev.Stat. 15:440.5, and 15:440.5(A)(8) requires that the child victim be "available to testify." Mr. Allen argues that the victim was not available to testify at trial, again as evidenced by the pretrial hearing transcripts.[3] She refused to answer questions under both direct and cross-examination concerning the specific allegations of wrong-doing. Therefore, Mr. Allen's contention that the videotape was inadmissible, theoretically bolsters his argument that the evidence against him is insufficient to convict him.
*93 Neither of Mr. Allen's first two assignments of error was preserved for review. Mr. Allen entered a guilty plea in this case, thus waiving any right of review of non-jurisdictional defects, including the sufficiency of the evidence to support a conviction. State v. Kennedy, 97-1726, p. 4 (La.App. 4 Cir. 11/10/98), 722 So.2d 1071, 1073, citing State v. Jenkins, 419 So.2d 463 (La.1982); State v. Bell, 332 So.2d 222 (La.1976). Additionally, Mr. Allen's plea was not entered under State v. Crosby, 338 So.2d 584 (La.1976), which permits a defendant to enter a plea of guilty while reserving the right to seek appellate review of pretrial rulings. The lengthy waiver of rights form specifically includes a waiver of the right to assert any affirmative defenses such as an illegal search or arrest or that a jury might have returned a finding of not guilty. In the lengthy Boykin colloquy, the trial court specifically informed Mr. Allen that he was giving up his right to assert any affirmative defenses or seek appellate review. The court further explained that defenses could be procedural or substantive and gave various examples, concluding with "any other statutory or constitutional right that you may have that could make it more difficult or impossible for the State to use evidence against you, thereby making it more difficult or impossible for the State to prove its case beyond a reasonable doubt in court."
The record establishes that at no time did Mr. Allen reserve any right to review of any pretrial rulings and that he clearly was informed of and waived the right to assert any defenses including an attack upon the sufficiency of the evidence. Therefore, neither of his first two assignments of error is preserved for review.
Nevertheless, we note that in his plea Mr. Allen refused to admit actual guilt. Instead, the record reflects that he entered his plea pursuant to North Carolina v. Alford, 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970), which decision was clearly explained to Mr. Allen by the trial court:
The Alford decision is a decision of the United States Supreme Court, Mr. Allen, this permits a person to plead guilty without admitting that he did the acts that constitute the crime. You can plead guilty under those circumstances when he finds it in his best interest to do so.
The requirements for a valid acceptance of an Alford plea were stated in a per curiam decision, State v. Bowie, 96-2987, pp. 1-2 (La.1/31/97), 687 So.2d 369:
The potential strength of the state's case and of any defenses reasonably suggested by the evidence may represent significant factors for the district court to weigh in accepting a proffered guilty plea which does not constitute an express admission of guilt, North Carolina v. Alford, 400 U.S. 25, 37-38, 91 S.Ct. 160, 167-68, 27 L.Ed.2d 162 (1970), but the court does not necessarily commit constitutional error by accepting a guilty plea in a case in which the "evidence before the judge indicate[s] that there [is] a valid defense." Id., 400 U.S. at 31, 91 S.Ct. at 166 (parsing Lynch v. Overholser, 369 U.S. 705, 82 S.Ct. 1063, 8 L.Ed.2d 211 (1962)). It is enough ... that the trial court satisfy itself that a factual basis exists for charging the defendant...; that the defendant has entered and maintains his no contest plea to the reduced charge; and, that that plea represents a knowing, voluntary and intelligent choice among the alternatives open to him. Alford, supra; Boykin v. Alabama, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969).
In addition to explaining to Mr. Allen that his plea was being entered under Alford, and that such a plea is entered by *94 a defendant because it is in his best interests to do so in light of all factors, the trial court required the State to summarize the evidence it intended to present at trial. The trial court had already heard all of the pretrial testimony as well as viewed the videotape, and thus the court was aware of the victim's ability to testify. The court also was aware that Mr. Allen was pleading to a reduced charge with a vastly lower fifteen-year maximum sentence instead of the mandatory life sentence without parole if he were found guilty as charged. The offer of the reduced plea was no doubt a recognition by the State of the weakness in its case in addition to being a factor in Mr. Allen's decision to make a "best interests" plea. Finally, the trial court exhaustively "Boykinized" Mr. Allen which included advising him of the elements and sentences of both the original charge and the charge to which he was pleading. It appears that the court committed no error in accepting Mr. Allen's Alford plea as the record amply demonstrates that the plea was a knowing, voluntary and intelligent choice among the alternatives available to the defendant.

ASSIGNMENT OF ERROR NUMBER 3:
In his final assignment of error, Mr. Allen argues that the trial court imposed an excessive sentence. For the procedural reasons discussed below, it appears that a review of this issue is premature.
The record in this case indicates that Mr. Allen was sentenced on May 19, 1999. On May 20, 1999 defense counsel filed a written motion to reconsider sentence. The motion was set for a hearing on July 14, 1999. On that date, the hearing was continued to September 23, 1999 because Mr. Allen was not present. The record does not reflect what occurred on that date. However, a supplemental minute entry from September 30, 1999 states that the matter was called for a hearing on the motion to reconsider sentence; Mr. Allen's trial counsel was present. The court then continued the matter without date because the case was on appeal. Thus, no ruling has ever been made on the motion to reconsider sentence which was timely filed under La.Code Crim. Proc. art. 881.1.
Both the First and Fifth Circuits have considered cases in which there had been no ruling on a motion to reconsider sentence. The approach of those circuits was set forth in State v. Wilson, 99-214, pp. 4-5 (La.App. 5 Cir. 6/30/99), 743 So.2d 728, 730:
This Court addressed the same problem in State v. Winfrey, 97-427 (La.App. 5th Cir.10/38/97) (sic), 703 So.2d 63, writ denied, 98-0264 (La.6/19/98), 719 So.2d 481. In that case, the defendant filed a motion to reconsider his one-hundred year enhanced sentence, which, on appeal, defendant claimed was excessive. This Court found that it would be premature to rule on the excessiveness issue while a motion to reconsider sentence was pending, and remanded the case with these instructions:
Rather than rule on the excessiveness issue while a motion for reconsideration is pending which may vacate the present sentence, we remand the case for a ruling on the motion and supplementation of the record with the results. If the motion to reconsider is granted and defendant is re-sentenced, he may appeal the new sentence. If the motion is denied or if it has already been ruled on, defendant must move to re-lodge this appeal within sixty days of the date of the ruling on the motion to reconsider sentence or the date of this opinion, whichever is later.

*95 State v. Winfrey, supra at 81; See also LSA C.Cr.P. art. 881.4-C; State v. Smith, 96-285 (La.App. 5th Cir.10/1/96), 683 So.2d 826; State v. Sanders, 618 So.2d 904 (La.App. 1st Cir.1993).
In a recent case from this Court, State v. Boyd, 00-0274 (La.App. 4 Cir. 7/19/00), 775 So.2d 463, the lack of a ruling on a motion to reconsider sentence was considered. The Court simply stated that it was not procedurally correct to review a defendant's sentence for excessiveness in such a circumstance. The Court affirmed the defendant's conviction and remanded the case for a ruling on the motion to reconsider, simultaneously reserving to the defendant the right to seek a new appeal from the ruling.
Considering that the record in the instant case reflects that the trial court has not held a hearing on the motion to reconsider sentence, and that a trial court has discretion to reduce the defendant's sentence if it believes such reduction is appropriate, we will not address the issue of the excessiveness of the sentence until the trial court has ruled upon the motion to reconsider.

CONCLUSION:
Accordingly, we affirm Mr. Allen's conviction, but remand for a ruling on the motion to reconsider sentence. As in Boyd, Mr. Allen's right to appeal from the ruling or a new sentence is reserved to him.
CONVICTION AFFIRMED; REMANDED.
NOTES
[1] The trial judge at sentencing was the Honorable Luke Petrovich, Judge Pro Tem.; the original trial judge was the Honorable Michael Kirby, who was subsequently elected to the bench of this Court.
[2] The victim's full name is being omitted from this opinion to protect her identity.
[3] The appellant further argues that the videotaped interview itself violates the requirement found in La.Rev.Stat. 15:440.5(A)(4) that the child's statement not be made "in response to questioning calculated to lead the child to make a particular statement." This argument was included in the memorandum filed in support of Mr. Allen's motion in limine to prohibit the State from introducing any hearsay accounts of the abuse. It should be noted that the trial court never formally ruled on the motion in limine; the court took it under advisement on the same day that Mr. Allen entered his guilty plea.